# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

BRUCE BROWN, derivatively on behalf of
ACLARIS THERAPEUTICS, INC.,

Plaintiff,

v.

NEAL WALKER, FRANK RUFFO, WILLIAM
HUMPHRIES, ANAND MEHRA, CHRISTOPHER
MOLINEAUX, ANDREW POWELL, BRYAN
REASONS, ANDREW SCHIFF, and STEPHEN A.
TULLMAN,

Defendants,

and

ACLARIS THERAPEUTICS, INC.,

Nominal Defendant.

C.A. No. ___1:19-cv-10876___

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Bruce Brown ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf

of Aclaris Therapeutics, Inc. ("Aclaris" or the "Company") files this Verified Shareholder

Derivative Complaint against Individual Defendants Neal Walker, Frank Ruffo, William

Humphries, Anand Mehra, Christopher Molineaux, Andrew Powell, Bryan Reasons, Andrew

Schiff, and Stephen A. Tullman, (collectively, the "Individual Defendants," and together with

Aclaris, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of

Aclaris, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and

violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for

1

Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Aclaris, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Aclaris directors and officers from at least May 8, 2018 through the present (the "Relevant Period").

2.      Aclaris is a biopharmaceutical company that discovers and markets novel small molecule therapies for immune-inflammatory conditions. The Company was founded by Defendants Neal Walker and Frank Ruffo in July 2012. The Company's premiere product, Eskata, is a topical solution that contains a hydrogen peroxide formula. The FDA has approved the usage of Eskata for treating seborrheic keratosis, a noncancerous skin growth that is commonly found in older adults.

3.      On June 20, 2019, a letter by the United States Food and Drug Administration ("FDA") was circulated (the "FDA Letter"). The FDA Letter expressed concern over Aclaris's advertising of Eskata, noting the Company's misleading statements and omissions relating to Eskata's efficacy and risk of harmful side effects. The FDA also disclosed that the Company had

2

already been warned of these defects in its advertising in earlier advisory correspondence before the advertisements were published.

4.   On this news, the price per share of Aclaris stock dropped $0.57, or 11.15%, over two trading days, from a closing price of $5.11 on June 19, 2019, to a closing price of $4.54 on June 21, 2019.

5.   In breach of their fiduciary duties, the Individual Defendants failed to maintain adequate controls.

6.   During the Relevant Period, the Individual Defendants also breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Aclaris's business and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Aclaris's advertisements for Eskata exaggerated the drug's efficacy and understated its risks, despite the FDA's prior warning of these marketing defects; (2) consequently, the Company was likely to encounter costly regulatory inquiries and penalties; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

7.   During the Relevant Period, the Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

8.   During the Relevant Period, the Individual Defendants additionally breached their fiduciary duties by causing the Company to fail to maintain internal controls.

9.     As a result of the Individual Defendants' misconduct, which has subjected Aclaris, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in two federal securities fraud class action lawsuits filed in the United States District Court for the Southern District of New York (the "Securities Class Actions")[1], the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the abuse of control, the gross mismanagement and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company has and will have to expend many millions of dollars.

10.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in the misconduct, the substantial likelihood of the directors' liability in this derivative action, the CEO's and CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Aclaris's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

---

[1] The Securities Class Actions were recently consolidated.

12.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

16.     Venue is proper in this District because the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

17.     Plaintiff is a current shareholder of Aclaris common stock. Plaintiff has continuously held Aclaris common stock at all relevant times.

### Nominal Defendant Aclaris

18.     Aclaris is a Delaware corporation with its principal executive offices at 640 Lee Road, Suite 200, Wayne, Pennsylvania 19087. Aclaris's common stock trades on the NASDAQ Exchange under the ticker symbol "ACRS."

### Defendant Walker

19.     Defendant Neal Walker ("Walker") co-founded the Company and has served as its CEO and President, as well as a director, since July 2012. According to the Company's Schedule 14A filed with the SEC on April 25, 2019 (the "2019 Proxy Statement"), as of February 1, 2019,

Defendant Walker beneficially owned 1,482,371 shares, or 3.5%, of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $6.96, Defendant Walker owned approximately $10.3 million worth of Aclaris common stock.

20.    For the fiscal year ended December 31, 2018, Defendant Walker received $4,363,392 in compensation from the Company. This included $550,000 in salary, $954,288 in stock awards, $2,626,344 in option awards, $221,100 in Non-Equity Incentive Plan Compensation, and $11,660 in all other compensation.

21.    The Company's 2019 Proxy Statement stated the following about Defendant Walker:

> Neal Walker co-founded our company and has served as President and Chief Executive Officer and a member of our Board since our inception in July 2012. Dr. Walker co-founded NeXeption, LLC in 2012 and NeXeption II, LLC in 2013. Between 2011 and 2012, Dr. Walker served as a consultant to a number of pharmaceutical companies. Dr. Walker co-founded and served as President and Chief Executive Officer and a member of the board of directors of Vicept Therapeutics, Inc., a dermatology-focused specialty pharmaceutical company, from 2009 until its acquisition by Allergan, Inc. in 2011. Previously, Dr. Walker co-founded and led a number of life science companies, including Octagon Research Solutions, Inc., a software and services provider to biopharmaceutical companies (acquired by Accenture plc), Trigenesis Therapeutics, Inc., a specialty dermatology company, where he served as Chief Medical Officer (acquired by Dr. Reddy's Laboratories Inc.), and Cutix Inc., a commercial dermatology company. He began his pharmaceutical industry career at Johnson and Johnson, Inc. Dr. Walker is a director of Alderya Therapeutics, Inc., a publicly held biotechnology company, as well as several private biotechnology companies. Dr. Walker received his M.B.A. degree from The Wharton School, University of Pennsylvania, his Doctor of Osteopathic Medicine degree from the Philadelphia College of Osteopathic Medicine and a B.A. degree in Biology from Lehigh University. Dr. Walker's experience as a board-certified dermatologist and the founder of our company and other pharmaceutical companies, his background in clinical and product development in dermatology and other fields, and his knowledge of the pharmaceutical industry contributed to the conclusion of our Board that he should serve as a director of our company.

**Defendant Ruffo**

22.     Defendant Frank Ruffo ("Ruffo") co-founded Aclaris and has served as its CFO since 2012.

23.     The Company's 2019 Proxy Statement stated the following about Defendant Ruffo:

Frank Ruffo co-founded our company and has served as our Chief Financial Officer since 2012. From January 2014 to December 2015, Mr. Ruffo served part-time as a financial consultant at Ralexar Therapeutics, Inc., a specialty dermatology company. Mr. Ruffo also served part-time as the Chief Financial Officer of VenatoRx Pharmaceuticals Inc., a pharmaceutical company, from 2011 to 2014 and the Chief Financial Officer of BioLeap, Inc. from 2010 to 2013. Prior to joining our company, Mr. Ruffo co-founded and served as Chief Financial Officer of Vicept Therapeutics, Inc. from 2009 until its acquisition by Allergan, Inc. in July 2011. Prior to joining Vicept Therapeutics, Inc., from 1996 to 2008, Mr. Ruffo served as the Vice President, Finance and Controller of CollaGenex Pharmaceuticals, Inc. He is a certified public accountant in Pennsylvania (inactive since 2008). Mr. Ruffo received his B.S. degree in business administration with a major in accounting from LaSalle University.

**Defendant Humphries**

24.     Defendant William Humphries ("Humphries") has served as a Company director since September 2016. He is also a member of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of February 1, 2019, Defendant Humphries beneficially owned 22,611 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $6.96, Defendant Humphries owned approximately $157,372 worth of Aclaris stock.

25.     For the fiscal year ended December 31, 2018, Defendant Humphries received $156,980 in compensation from the Company. This included $46,500 in fees earned or cash paid and $110,480 in option awards.

26.     The Company's 2019 Proxy Statement stated the following about Defendant Humphries:

Mr. Humphries has served as a member of our Board since September 2016. Since January 2017, he has served as Executive Vice President of Ortho Dermatologics, the dermatology division of Bausch Health Companies, Inc. From 2012 to December 2016, he served as President and Chief Executive Officer of the North American business of Merz, Inc., an affiliate of Merz Pharma Group, a specialty healthcare company. From 2006 to 2012, Mr. Humphries served in a number of leadership positions with Stiefel Laboratories, Inc., a dermatology pharmaceutical company, including as its Chief Commercial Officer and then as President beginning in 2008. Stiefel was acquired by GlaxoSmithKline in 2009, after which Mr. Humphries served as the President of Dermatology for Stiefel from 2009 until March 2012. Mr. Humphries previously held multiple senior executive roles in sales and marketing, business development and international marketing for Allergan, Inc., concluding as Vice President of its U.S. skincare business. Mr. Humphries currently serves on the board of directors of and is the chair of Clearside Biomedical, Inc., a publicly held biopharmaceutical company. He holds a B.A. degree from Bucknell University and an M.B.A. degree from Pepperdine University. Our Board believes that Mr. Humphries' experience as a pharmaceutical company executive provides him with the qualifications and skills to serve as a director of our company.

**Defendant Mehra**

27.     Defendant Anand Mehra ("Mehra") has served as a Company director since September 2014. He also serves as the Chair of the Compensation Committee. According to the 2019 Proxy Statement, as of February 1, 2019, Defendant Mehra beneficially owned 1,932,205 shares, or 4.7%, of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $6.96, Defendant Mehra owned approximately $13.5 million worth of Aclaris stock.

28.     For the fiscal year ended December 31, 2018, Defendant Mehra received $155,480 in compensation from the Company. This included $45,000 in fees earned or cash paid and $110,480 in option awards.

29.     The Company's 2019 Proxy Statement stated the following about Defendant Mehra:

Anand Mehra, M.D. has served as a member of our Board since September 2014. Dr. Mehra joined Sofinnova Investments, Inc. (fka Sofinnova Ventures, Inc.), a

biotech investment firm, in 2007 and currently serves as a general partner. Prior to joining Sofinnova, Dr. Mehra worked in J.P. Morgan's private equity and venture capital group, and before that, Dr. Mehra was a consultant in McKinsey & Company's pharmaceutical practice. Dr. Mehra currently serves on the boards of directors of the publicly held companies Spark Therapeutics, Inc. and Merus N.V., as well as several private companies. Within the past five years, he also served on the boards of directors of the publicly held pharmaceutical companies Marinus Pharmaceuticals, Inc. and Aerie Pharmaceuticals, Inc. Dr. Mehra received his B.A. degree in political philosophy from the University of Virginia and an M.D. degree from Columbia University's College of Physicians and Surgeons. Our Board believes that Dr. Mehra's extensive experience in the life sciences industry, his service on the boards of directors of other public life sciences companies and his extensive leadership experience qualify him to serve as a director of our company.

**Defendant Molineaux**

30.     Defendant Christopher Molineaux ("Molineaux") has served as a Company director since January 2014 and as the Chairman of the Board since June 2019. Defendant Molineaux also serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of February 1, 2019, Defendant Molineaux beneficially owned 37,247 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $6.96, Defendant Molineaux owned approximately $259,239 worth of Aclaris stock.

31.     For the fiscal year ended December 31, 2018, Defendant Molineaux received $157,980 in compensation from the Company. This included $47,500 in fees earned or cash paid and $110,480 in option awards.

32.     The Company's 2019 Proxy Statement stated the following about Defendant Molineaux:

Christopher Molineaux has served as a member of our Board since January 2014. Since 2010, Mr. Molineaux has served as President and Chief Executive Officer of Life Sciences Pennsylvania, formerly Pennsylvania Bio, a pharmaceutical and biotech industry advocacy organization, and served as Senior Vice President, Membership Services from 2009 until 2010. Prior to joining Life Sciences Pennsylvania, Mr. Molineaux served as worldwide Vice President of

Pharmaceutical Communications and Public Affairs for Johnson & Johnson. Mr. Molineaux previously served as Vice President for Public Affairs at the Pharmaceutical Research and Manufacturers Association. He holds a B.A. degree from the College of the Holy Cross. Our Board believes that Mr. Molineaux's substantial pharmaceutical and biotechnology industry experience qualifies him to serve as a director of our company.

**Defendant Powell**

33.      Defendant Andrew Powell ("Powell") has served as a Company director since January 2017. Defendant Powell serves as a member of the Nominating and Corporate Governance Committee and the Audit Committee. According to the 2019 Proxy Statement, as of February 1, 2019, Defendant Powell beneficially owned 26,055 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $6.96, Defendant Powell owned approximately $181,342 worth of Aclaris stock.

34.      For the fiscal year ended December 31, 2018, Defendant Powell received $156,980 in compensation from the Company. This included $46,500 in fees earned or cash paid and $110,480 in option awards.

35.      The Company's 2019 Proxy Statement stated the following about Defendant Powell:

Andrew Powell is an independent consultant who has served as a member of our Board since January 2017. He also serves on the boards of Landec Corporation, a publicly held health and wellness solutions company, and Synthorx Inc., a publicly held biopharmaceutical company. Mr. Powell previously served as Senior Vice President, General Counsel and Corporate Secretary of Medivation, Inc. from May 2015 until November 2016, when the company was acquired by Pfizer, Inc. Mr. Powell served as Executive Vice President, General Counsel and Corporate Secretary of InterMune, Inc. from September 2013 to March 2015. From 2009 to 2013, he served as Executive Vice President, General Counsel and Secretary at Cornerstone Therapeutics, Inc. From 2008 to 2009, Mr. Powell served as Senior Vice President and General Counsel at ImClone Systems, Inc. From 2004 to 2008, he was General Counsel at Collagenex Pharmaceuticals, Inc. Earlier in his career, Mr. Powell held positions of increasing responsibility for nearly 15 years at the multi-national healthcare company Baxter International, Inc., where he was instrumental in a series of transactions that established Baxter throughout Asia. Mr.

Powell holds a B.A. degree from the University of North Carolina at Chapel Hill and a J.D. from Stanford Law School. Our Board believes that Mr. Powell's unique expertise in the areas of commercialization strategy, expansion (both domestic and international), governance, compliance and mergers and acquisitions qualifies him to serve as a director of our company.

**Defendant Reasons**

36.     Defendant Bryan Reasons ("Reasons") has served as a Company director since April 2018. He also serves as Chair of the Audit Committee. According to the 2019 Proxy Statement, as of February 2019, Defendant Reasons beneficially owned 4,888 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $6.96, Defendant Reasons owned approximately $34,020 worth of Aclaris stock.

37.     For the fiscal year ended December 31, 2018, Defendant Reasons received $255,655 in total compensation. This included $35,335 in fees earned or cash paid and $220,320 in option awards.

38.     The Company's 2019 Proxy Statement stated the following about Reasons:

Bryan Reasons has served as a member of our Board since April 2018. Since March 2019, Mr. Reasons has served as Executive Vice President and Chief Financial Officer of Mallinckrodt plc. Prior to joining Mallinckrodt, Mr. Reasons served as Chief Financial Officer of Amneal Pharmaceuticals, Inc. from May 2018 until January 2019 and as Senior Vice President, Finance and Chief Financial Officer of Impax Laboratories, Inc. from December 2012 until Amneal and Impax completed their business combination in May 2018. Mr. Reasons previously served as Impax's Acting Chief Financial Officer from June 2012 to December 2012 and as its Vice President, Finance from January 2012 to June 2012. Prior to joining Impax, Mr. Reasons was with Cephalon, Inc., a biopharmaceutical company, serving as Vice President, Finance from 2010 to 2011 and as Vice President, Risk Management and General Auditor from 2005 to 2010. Following the acquisition of Cephalon by Teva Pharmaceutical Industries Ltd., he served as Vice President, Finance of Teva from 2011 to 2012. Prior to joining Cephalon, Mr. Reasons held various finance management positions at E.I. Du Pont De Nemours and Company from 2003 to 2005 and previously worked at PricewaterhouseCoopers LLP from 1992 to 2003, including as a senior manager. Since March 2017, Mr. Reasons has served on the board of directors and on the audit committee of Recro Pharma, Inc., a specialty

pharmaceutical company. Mr. Reasons has a B.S. degree in accounting from The Pennsylvania State University and an M.B.A. degree from Widener University. He is a certified public accountant in the Commonwealth of Pennsylvania. Our Board believes that Mr. Reasons' extensive experience in the pharmaceutical industry, including his experience in senior leadership positions at a number of large pharmaceutical companies, as well as his expertise in financial and accounting matters, qualifies him to serve as a director of our company.

**Defendant Schiff**

39.     Defendant Andrew Schiff ("Schiff") has served as a Company director since August 2017. He also serves as a member of the Compensation Committee.

40.     For the fiscal year ended December 31, 2018, Defendant Schiff received $150,480 in compensation from the Company. This included $40,000 in fees earned or cash paid and $110,480 in option awards. According to the 2019 Proxy Statement, as of February 1, 2019, Defendant Schiff beneficially owned 648,899 shares, or 1.6%, of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $6.96, Defendant Schiff owned approximately $4.5 million worth of Aclaris stock.

41.     The Company's 2019 Proxy Statement stated the following about Defendant Schiff:

Dr. Schiff has served as a member of our Board since August 2017. Dr. Schiff joined Aisling Capital in September of 1999 and currently serves as one of the firm's managing partners. Prior to joining Aisling Capital, Dr. Schiff practiced internal medicine for six years at The New York Presbyterian Hospital, where he maintains his position as a Clinical Assistant Professor of Medicine. Dr. Schiff served as a director of ZELTIQ Aesthetics, Inc., a publicly held medical technology company, from 2010 until its acquisition by Allergan plc in May 2017. He also served on the board of directors of Agile Therapeutics, Inc., a publicly held women's health specialty pharmaceutical company, from 2012 until February 2016. Dr. Schiff currently serves as a director of a number of private companies. He is a longtime supporter and board member of the Visiting Nurse Service of New York, as well as other charitable organizations. Dr. Schiff received an M.D. degree from Cornell University Medical College, his M.B.A. degree from Columbia University, and his B.S. with honors in Neuroscience from Brown University. Our Board believes that Dr. Schiff's medical background and venture experience qualify       him       to       serve       as       a       director       of       our       company.

12

**Defendant Tullman**

42.     Defendant Stephen A. Tullman ("Tullman") served as Chairman of the Board from August 2012 until his resignation in June 2019. According to the 2019 Proxy Statement, as of February 1, 2019, Defendant Tullman beneficially owned 659,422 shares, or 1.6%, of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $6.96, Defendant Tullman owned approximately $4.6 million worth of Aclaris stock.

43.     For the fiscal year ended December 31, 2018, Defendant Tullman received $100,000 in compensation from the Company, entirely comprised of fees earned or cash paid.

44.     The Company's 2019 Proxy Statement stated the following about Defendant Tullman:

> Stephen A. Tullman has served as Chairman of our Board since August 2012. Mr. Tullman co-founded NeXeption, Inc., a biopharmaceutical assets management company, in 2011 and its affiliated entity NeXeption, LLC in 2012 and served as the managing member of NeXeption, LLC until 2016. Mr. Tullman co-founded NeXeption II, LLC in 2013 and currently serves as the managing member of NeXeption II, LLC and certain of its affiliates. He previously served as Chairman, President and Chief Executive Officer of Ceptaris Therapeutics, Inc., a biopharmaceutical company, from 2011 until its acquisition by Actelion US Holdings Company, now a subsidiary of Johnson & Johnson, in 2013. Mr. Tullman served as Chairman of Vicept Therapeutics, Inc. from 2009 until its acquisition by Allergan, Inc. in 2011. In 2005, Mr. Tullman co-founded Ception Therapeutics, Inc. and served as its President and Chief Executive Officer until its acquisition by Cephalon, Inc. in 2010. In 2003, Mr. Tullman co-founded Trigenesis Therapeutics, Inc., where he served as its Chief Business Officer (acquired by Dr. Reddy's Laboratories Inc.) Mr. Tullman began his career at SmithKline Beecham, a pharmaceutical company, where he held positions of increasing responsibility in finance, sales, marketing, and research and development. Mr. Tullman currently serves as the chairman of the board of directors of Ralexar Therapeutics, Inc., a specialty dermatology company, and on the boards of directors of several other privately held companies. Mr. Tullman received a B.S. degree in Accounting from Rutgers University. Our Board believes that Mr. Tullman's leadership, executive, managerial and business experience with several life sciences companies qualify him to serve as a director of our company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

45.      By reason of their positions as officers and/or directors and fiduciaries of Aclaris and because of their ability to control the business and corporate affairs of Aclaris, the Individual Defendants owed Aclaris and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Aclaris in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Aclaris and its shareholders so as to benefit all shareholders equally.

46.      Each director and officer of the Company owes to Aclaris and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

47.      The Individual Defendants, because of their positions of control and authority as directors and/or officers of Aclaris, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48.      To discharge their duties, the officers and directors of Aclaris were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

49.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Aclaris, the absence of good faith on their

14

part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Aclaris's Board at all relevant times.

50.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ Exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC including all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

51.     To discharge their duties, the officers and directors of Aclaris were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Aclaris were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to Aclaris's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Aclaris conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Aclaris and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Aclaris's operations would comply with all applicable laws and Aclaris's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52.     Each of the Individual Defendants further owed to Aclaris and the shareholders the duty of loyalty requiring that each favor Aclaris's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

53.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Aclaris and were at all times acting within the course and scope of such agency.

54.     Because of their advisory, executive, managerial, and directorial positions with Aclaris, each of the Individual Defendants had access to adverse, non-public information about the Company.

55.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Aclaris.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

57.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations

of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a) of the Exchange Act.

58.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Aclaris, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

59.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

60.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Aclaris and was at all times acting within the course and scope of such agency.

## ACLARIS'S CODE OF CONDUCT

61.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct") states that "every director, officer, and employee (collectively, "personnel")" must "read and

understand the Code of Conduct and its application to the performance of his or her business responsibilities."

62.     The Code of Conduct provides that the Company engages in honest and fair business practices:

> You are expected to deal fairly with our partners, suppliers, contributors, employees and anyone else with whom you have contact in the course of performing your job. Be aware that the Federal Trade Commission Act provides that "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." It is a violation of the Federal Trade Commission Act to engage in deceptive, unfair or unethical practices and to make misrepresentations in connection with sales activities.

63.     The Code of Conduct pledges the Company's compliance with the healthcare laws of the United States and other countries in which it operates:

> Various laws and regulatory requirements worldwide govern the manufacture, labeling, sale, distribution, government contracting, marketing, and promotion of our Company's products in order to assure their safety and efficacy. Violations of these laws can result in severe penalties to the Company and individual personnel.

64. The Code of Conduct further contains a section outlining the Company's whistleblower and "strict" non-retaliation policies, which states in relevant part:

> Aclaris Health adheres to a strict non-retaliation policy. We will not tolerate harassment, retaliation, or any kind of discrimination or adverse action against an Employee who:
> - Makes a good-faith complaint or report about suspected Company or Employee violations of this Code, applicable laws, or Aclaris Health's policies
> - Provides information (or causes information to be provided) or assists in an investigation
> - Testifies or participates in a proceeding relating to violations of law Any Employee who reports a violation will be treated with dignity and respect. Retaliation against anyone who reports an issue, provides information, or otherwise assists in a compliance investigation will, in itself, be treated as a violation of this Code. Any Employee found to have retaliated against another Employee in violation of this policy will be subject to disciplinary action, up to and including termination.

19

65.     The Code of Conduct section titled "The Board of Directors" provides that:

The Code will be strictly enforced throughout the Company and violations will be dealt with immediately, including subjecting persons to corrective and/or disciplinary action such as dismissal or removal from office. Employees who fail to comply with this Code of Business Conduct or to cooperate with any compliance investigation will be subject to disciplinary action. Employees who direct, approve, or condone violations of this Code, or have knowledge of a violation and do not act promptly to report and correct it, will be subject to disciplinary action. Disciplinary action may include termination of employment. Violations of the Code that involve illegal behavior will be reported to the appropriate government authorities for enforcement proceedings.

66.     The Individual Defendants violated the Code of Conduct by causing the Company to engage in the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement and violations of Sections 14(a) and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

67.     Aclaris is a biopharmaceutical company that specializes in developing solutions using small molecule technology to bridge treatment gaps in immune-inflammatory diseases.

68.     Eskata, the Company's premiere product, is a topical solution containing a hydrogen peroxide formula. The FDA has approved Eskata's use for the treatment of seborrheic keratosis, a noncancerous skin growth that commonly found in older adults.

### False and Misleading Statements

*May 8, 2018 Press Release and Form 10-Q*

69.     On May 8, 2018, Aclaris issued a press release to announce its financial results for the first fiscal quarter of 2018. The press release discussed the planned release of Eskata and the Company's financial data for the quarter, stating, in relevant part:

"The first quarter of 2018 was a busy one as we prepared for the launch of ESKATA™ (hydrogen peroxide) Topical Solution, 40% (w/w), the first and only FDA-approved topical treatment for raised seborrheic keratosis (SK). We held the ESKATA Launch Meeting last week, and ESKATA is now officially available for physicians and their patients," said Brett Fair, Chief Commercial Officer of Aclaris.

\* \* \*

### First Quarter 2018 Financial Results

- Net loss was $30.2 million for the first quarter of 2018, compared to $12.6 million for the first quarter of 2017.
- Revenue of $1.1 million and cost of revenue of $1.0 million for the first quarter of 2018 related to Aclaris's contract research business acquired in August 2017.

70.     Also on May 8, 2018, the Company filed with the SEC its quarterly report for the period ended March 31, 2018, on a Form 10-Q (the "1Q18"), which was signed by Defendants Walker and Ruffo.

71.     The Company provided in the 1Q18, under the section titled "Risk Factors," that its risk factors "have not changed materially" from Alcaris's annual report for the fiscal year ended December 31, 2017 (the "2017 10-K"), filed on March 12, 2018. Under a section entitled "Risks Related to Regulatory Approval of Our Drug Candidates and Other Legal Compliance Matters," the 2017 10-K stated, in relevant part:

> **ESKATA, or any drug candidate for which we obtain marketing approval, could be subject to post-marketing restrictions or recall or withdrawal from the market, and we may be subject to penalties if we fail to comply with regulatory requirements or if we experience unanticipated problems with our drug candidates, when and if any of them are approved.**
>
> ESKATA, or any drug candidate for which we obtain marketing approval, along with the manufacturing processes, post-approval clinical data, labeling, advertising and promotional activities for such drug candidate, will be subject to continual requirements of and review by the FDA and other regulatory authorities. These requirements include submissions of safety and other post-marketing information and reports, registration and listing requirements, cGMP requirements relating to manufacturing, quality control, quality assurance and corresponding maintenance of records and documents, requirements regarding the distribution of samples to physicians and recordkeeping. **Even if marketing approval of a drug candidate is granted, the approval may be subject to limitations on the indicated uses for which the drug candidate may be marketed or to the conditions of approval,**

*including the requirement to implement a risk evaluation and mitigation strategy.* If any of our drug candidates receives marketing approval, the accompanying label may limit the approved use of our drug, which could limit sales of the drug.

The FDA may also impose requirements for costly post-marketing studies or clinical trials and surveillance to monitor the safety or efficacy of the drug. The FDA closely regulates the post-approval marketing and promotion of drugs to ensure drugs are marketed only for the approved indications and in accordance with the provisions of the approved labeling. *The FDA imposes stringent restrictions on manufacturers' communications regarding off-label use and if we do not market our drugs for their approved indications, we may be subject to enforcement action for off-label marketing. Violations of the Federal Food, Drug, and Cosmetic Act relating to the promotion of prescription drugs may lead to investigations alleging violations of federal and state healthcare fraud and abuse laws, as well as state consumer protection laws.*

(Emphasis added to second and third paragraphs).

72.     Attached to the 1Q18 were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Walker and Ruffo attesting to the accuracy of the 1Q18.

### *August 3, 2018 Press Release and Form 10-Q*

73.     On August 3, 2018, Aclaris issued a press release to announce its financial results for the second fiscal quarter of 2018. The press release discussed the planned release of Eskata with the following statement from Defendant Walker:

> The second quarter represents an important milestone with the launch of ESKATA. This is an exciting time for Aclaris as we establish ourselves as a fully integrated commercial organization with a robust clinical-stage pipeline and drug discovery engine...

74.     The press release went on to detail the sales activity and financial results for the second quarter of 2018, stating, in relevant part:

**Commercial Update:**
Sales Force Activity:
- Sales force focused on driving clinical and business integration in ESKATA accounts; ongoing in-service programs to support successful training and product integration.
- Over 800 ESKATA accounts opened to date

- Over 40 ESKATA peer-to-peer speaker programs conducted to date

* * *

**Financial Highlights**
***Second Quarter 2018 Financial Results***

- For the quarter ended June 30, 2018, total net revenues were $3.7 million, which consisted of ESKATA sales of $1.5 million, contract research revenue of $1.1 million, and other revenue of $1.0 million...

* * *

- For the quarter ended June 30, 2018, net loss was $31.2 million, or $1.01 per basic and diluted share, as compared to $14.8 million, or $0.56 per basic and diluted share, for the second quarter of 2017....

75. Also on August 3, 2018, the Company filed with the SEC its quarterly report for the period ended June 30, 2018, on a Form 10-Q (the "2Q18"), which confirmed the financial results discussed in the press release. The 2Q18 was signed by Defendants Walker and Ruffo.

76. The Company provided in the 2Q18, under the section titled "Risk Factors," that its risk factors "have not changed materially" from those described previously in the 2017 10-K.

77. Attached to the 2Q18 were SOX certifications signed by Defendants Walker and Ruffo attesting to the accuracy of the 2Q18.

### November 6, 2018 Press Release and Form 10-Q

78. On November 6, 2018, Aclaris issued a press release to announce its financial results for the third fiscal quarter of 2018. The Company reported a total revenue of $1.6 million, with $0.5 million attributable to net Eskata sales, and a net loss of $32.7 million.

79. Also on November 6, 2018, the Company filed with the SEC its quarterly report for the period ended September 30, 2018, on a Form 10-Q (the "3Q18"), which was signed by Defendants Walker and Ruffo.

80. The Company provided in the 3Q18, under the section titled "Risk Factors," that its risk factors "have not changed materially" from those described in the 2017 10-K.

81.     Attached to the 3Q18 were SOX certifications signed by Defendants Walker and Ruffo attesting to the accuracy of the 3Q18.

### March 18, 2019 Press Release and Form 10-K

82.     On March 18, 2019, Aclaris issued a press release to announce its financial results for the fourth quarter and fiscal year ended December 31, 2018. For the fiscal year 2018, the Company reported total revenue of $10.1 million, of which $2.8 million was attributable to net Eskata sales, and a net loss of $132.7 million.

83.     Also on March 18, 2019, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2018 on a Form 10-K (the "2018 10-K"), which was signed by Defendants Walker, Ruffo, Tullman, Molineaux, Mehra, Humphries, Powell, Schiff, and Reasons.

84.     The 2018 10-K discussed FDA requirements pertaining to drug marketing and the consequences for violating such regulations, stating, in relevant part:

> ***Drugs manufactured or distributed pursuant to FDA approvals are subject to pervasive and continuing regulation by the FDA and other governmental agencies, including, among other things, requirements related to recordkeeping, periodic reporting, product sampling and distribution, advertising and promotion*** and reporting of adverse experiences with the product. ***Once an approval is granted, the FDA may withdraw the approval if compliance with regulatory requirements is not maintained*** or if problems occur after the product reaches the market.
>
> * * *
>
> The FDA strictly regulates the marketing, labeling, advertising and promotion of drug products that are placed on the market. Drugs may be promoted only for the approved indications and in accordance with the provisions of the approved label. However, companies may share truthful and not misleading information that is otherwise consistent with the product's FDA approved labeling. ***The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability.***

(Emphasis added).

85.     The 2018 10-K, in a section entitled "Risks Related to Regulatory Approval of Our Drug Candidates and Other Legal Compliance Matters," discussed the application of these rules and regulations to its drugs, including Eskata. The 2018 10-K detailed the possible negative consequences of regulatory violations, stating, in relevant part:

> ***ESKATA, RHOFADE or any drug candidate for which we obtain marketing approval, could be subject to post-marketing restrictions or recall or withdrawal from the market, and we may be subject to penalties if we fail to comply with regulatory requirements or if we experience unanticipated problems with our drug candidates, when and if any of them are approved.***
>
> ESKATA, RHOFADE or any drug candidate for which we obtain marketing approval, along with the manufacturing processes, post-approval clinical data, labeling, advertising and promotional activities for such drug candidate, will be subject to continual requirements of and review by the FDA and other regulatory authorities. These requirements include submissions of safety and other post-marketing information and reports, registration and listing requirements, cGMP requirements related to manufacturing, quality control, quality assurance and corresponding maintenance of records and documents, requirements regarding the distribution of samples to physicians and recordkeeping. ***Even if marketing approval of a drug candidate is granted, the approval may be subject to limitation on the indicated uses for which the drug candidate may be marketed or to the conditions of approval, including the requirement to implement a risk evaluation and mitigation strategy.*** If any of our drug candidates receives marketing approval, the accompanying label may limit the approved use of our drug, which could limit sales of the drug.
>
> The FDA may also impose requirements for costly post-marketing studies or clinical trials and surveillance to monitor the safety or efficacy of the drug. ***The FDA closely regulates the post-approval marketing and promotion of drugs to ensure drugs are marketed only for the approved indications and in accordance with the provisions of the approved labeling. The FDA imposes stringent restrictions on manufacturers' communications regarding off-label use and if we do not market our drugs for their approved indications, we may be subject to enforcement action for off-label marketing.*** Violations of the FDCA relating to the promotion of prescription drugs may lead to investigations alleging violations of federal and state health care fraud and abuse laws, as well as state consumer protection laws.

(Emphasis added).

86.     Attached to the 2018 10-K were SOX certifications signed by Defendants Walker and Ruffo attesting to the accuracy of the 2018 10-K.

25

*April 25, 2019 Proxy Statement*

87.     The Company filed its 2019 Proxy Statement with the SEC on April 25, 2019. Defendants Walker, Humphries, Schiff, Mehra, Molineaux, Powell, Reasons, and Tullman solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[17]

88.     The 2019 Proxy Statement stated that the Company's Code of Conduct "applies to all officers, directors, and employees."

89.     These statements were false and misleading because the Individual Defendants willfully or recklessly failed to disclose and/or caused the Company to fail to disclose, *inter alia*, that: (1) Aclaris's advertisements for Eskata exaggerated the drug's efficacy and understated its risks, despite the FDA's prior warning of these marketing defects; (2) consequently, the Company was likely to encounter costly regulatory inquiries and penalties; and; (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. The Individual Defendants, again, failed to disclose violations of the Code of Conduct.

*May 8, 2019 Press Release and Form 10-Q*

90.     On May 8, 2019, Aclaris issued a press release to announce its financial results for the first fiscal quarter of 2019. The Company reported total revenue of $5.0 million, of which $0.1 million was attributable to net Eskata sales, with a net loss of $37.6 million.

---

[17] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

91.     On the same day, the Company filed its quarterly report with the SEC for the period ended March 31, 2019, on a Form 10-Q (the "1Q19"), which was signed by Defendants Walker and Ruffo. The 1Q19 confirmed the financial results disclosed in the press release.

92.     The Company provided in the 1Q19, under the section titled "Risk Factors," that its risk factors "have not changed materially" from those outlined in the 2018 10-K.

93.     Attached to the 1Q19 were SOX certifications signed by Defendants Walker and Ruffo attesting to the accuracy of the 1Q19.

94.     The statements in ¶¶ 69-88 and 90-93 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual  Defendants improperly failed to disclose, *inter alia*, that: (1) Aclaris's advertisements for Eskata exaggerated the drug's efficacy and understated its risks, despite the FDA's prior warning of these marketing defects; (2) consequently, the Company was likely to encounter costly regulatory inquiries and penalties; and; (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

95.     On June 20, 2019, the FDA Letter was circulated. The FDA Letter characterized the Company's advertisement for Eskata as "mak[ing] false or misleading claims" about the product, notably its efficacy and risks of side effects. "[E]specially concerning" was "a direct-to-consumer video of an interview featuring a paid Aclaris spokesperson," because it omitted important information such as "the risks of serious eye disorders... in the case of exposure to the eye and severe skin reactions including scarring."

96.     The FDA also detailed its prior correspondence with the Company wherein the agency had cautioned Aclaris about these very concerns. The FDA Letter stated, in relevant part:

> OPDP notes that *our advisory comments dated March 29, 2018, addressed draft Aclaris presentations for Eskata with certain similarities to the video in this letter*. In these advisory comments, OPDP recommended that Aclaris revise proposed presentations so that they did not omit material information regarding the risks associated with Eskata or otherwise misrepresent important risk information. We also recommended that Aclaris revise proposed presentations so that they did not overstate the efficacy of Eskata. *We are concerned that Aclaris is promoting Eskata in a manner that fails to adequately present the serious risks of the drug or describe the efficacy of the drug in a truthful and non-misleading manner despite this direction from OPDP.*

(Emphasis added).

97.     When news of the FDA Letter reached the public, the Company's price per share dropped $0.57, or 11.15%, over two trading days, from a closing price of $5.11 on June 19, 2019, to a closing price of $4.54 on June 21, 2019.

## DAMAGES TO ACLARIS

98.     As a direct and proximate result of the Individual Defendants' conduct, Aclaris has lost and expended, and will lose and expend, many millions of dollars.

99.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions, and other lawsuits filed against the Company, its CEO, and its CFO and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

100.     Additionally, these expenditures include, but are not limited to, the excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company and whose compensation was excessive.

101.   As a direct and proximate result of the Individual Defendants' conduct, Aclaris has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

102.   Plaintiff brings this action derivatively and for the benefit of Aclaris to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Aclaris, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

103.   Aclaris is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

104.   Plaintiff is, and has continuously been at all relevant times, a shareholder of Aclaris. Plaintiff will adequately and fairly represent the interests of Aclaris in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

105.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

106.   A pre-suit demand on the Board of Aclaris is futile and, therefore, excused. At the time of the filing of this action, the Board consists of the following eight individuals: Defendants Walker, Molineaux, Humphries, Mehra, Powell, Reasons, and Schiff (the "Director-Defendants");

and non-defendant Maxine Gowen (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who were on the Board at the time this action was commenced.

107.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme to make and/or cause the Company to make false and misleading statements and omissions of material facts.

108.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. That fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

109.    Additional reasons that demand on Defendant Walker is futile follow. After co-founding the Company, Defendant Walker has served as the Company's President, CEO, and as a member of the Board since July 2012. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Walker with his principal occupation, and he receives handsome compensation, including $4,363,392 during the fiscal year ended December 31, 2018. Defendant Walker was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the 1Q18, 2Q18, 3Q18, 2018 10-K, and 1Q19, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to

monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Walker is a defendant in the Securities Class Actions. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Walker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Humphries is futile follow. Defendant Humphries has served as a Company director since 2016 and serves as a member of the Quality of Care and Patient Safety Committee. Defendant Humphries receives handsome compensation, including $156,980 during the fiscal year ended December 31, 2018. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Humphries signed, and thus personally made, the false and misleading statements in the 2018 10-K. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Humphries breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

111.    Additional reasons that demand on the Defendant Mehra is futile follow. Defendant Mehra has served as a Company director since September 2014. He also serves as Chairman of the Compensation Committee. Defendant Mehra receives handsome compensation, including

$155,480 during the fiscal year ended December 31, 2018. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Mehra signed, and thus personally made, the false and misleading statements in the 2018 10-K. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Mehra breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Molineaux is futile follow. Defendant Molineaux has served as a Company director since January 2014. He also serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Molineaux receives handsome compensation, including $157,980 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's participation in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Molineaux signed, and thus personally made, the false and misleading statements in the 2018 10-K. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Molineaux breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant Powell is futile follow. Defendant Powell has served as a Company director since January 2017. He also serves as a member of the Nominating and Corporate Governance Committee and the Audit Committee. Defendant Powell receives handsome compensation, including $156,980 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Powell signed, and thus personally made, the false and misleading statements in the 2018 10-K. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Powell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

114.    Additional reasons that demand on Defendant Reasons is futile follow. Defendant Reasons served as a Company director since April 2018. He also serves as Chairman of the Audit Committee. Defendant Reasons receives handsome compensation, including $255,655 during the fiscal year ended December 31, 2018. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Reasons signed, and thus personally made, the false and misleading statements in the 2018 10-K. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant

Reasons breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

115.    Additional reasons that demand on Defendant Schiff is futile follow. Defendant Schiff has served as a Company director since August 2017. He also serves as a member of the Compensation Committee. Defendant Schiff receives handsome compensation, including $150,480 during the fiscal year ended December 31, 2018. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Schiff signed, and thus personally made, the false and misleading statements in the 2018 10-K. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Schiff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116.    Additional reasons that demand on the Board is futile follow.

117.    Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.

118.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading

statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

119.    Aclaris has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Aclaris any part of the damages Aclaris suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

120.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

121.    The acts complained of herein constitute violations of fiduciary duties owed by Aclaris officers and directors, and these acts are incapable of ratification.

122.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e.,

monies belonging to the stockholders of Aclaris. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Aclaris, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

123.    If there is no directors' and officers' liability insurance, then the Directors will not cause Aclaris to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

124.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

125.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

126.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

127.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

128.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

129.    Under the direction and watch of the Directors serving on the Board, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) Aclaris's advertisements for Eskata exaggerated the drug's efficacy and understated its risks, despite the FDA's prior warning of these marketing defects; (2) consequently, the Company was likely to encounter costly regulatory inquiries and penalties; and; (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

130.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that it purported to employ "performance-based compensation," while failing to disclose that the Company's share price was artificially

inflated as a result of false and misleading statements alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated. Thus, making the executive compensation undeserved and excessive and the shareholders unable to make informed votes in the 2019 Proxy Statement.

131.    The 2019 Proxy Statement also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations and make accurate and non-misleading public disclosures to its investors and consumers. By issuing false and misleading statements to the investing public and its consumers, the Individual Defendants violated the Code of Conduct. The 2019 Proxy Statement failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

132.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

133.    The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Walker, Humphries, and Schiff, which allowed them to continue breaching their fiduciary duties to Aclaris.

134.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

135.    Plaintiff on behalf of Aclaris has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

136.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

137.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Aclaris's business and affairs.

138.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

139.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Aclaris.

140.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

141.    The Individual Defendants further breached their fiduciary duties by causing themselves to receive excessive compensation from the Company given their misconduct.

142.    In yet further breach of their fiduciary duties owed to Aclaris, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Aclaris's advertisements for Eskata exaggerated the drug's efficacy and understated its risks, despite the FDA's prior warning of these marketing defects; (2) consequently, the Company was likely to encounter costly regulatory inquiries and penalties; and; (3) the Company failed to maintain

internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

143.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

144.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

145.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

146.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

147.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Aclaris has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

148.    Plaintiff on behalf of Aclaris has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

149.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Aclaris.

151.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Aclaris that was tied to the performance or artificially inflated valuation of Aclaris, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

152.    The Individual Defendants were also unjustly enriched by causing themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct.

153.    Plaintiff, as a shareholder and a representative of Aclaris, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from

benefits and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

154.    Plaintiff on behalf of Aclaris has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

155.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Aclaris, for which they are legally responsible.

157.    As a direct and proximate result of the Individual Defendants' abuse of control, Aclaris has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Aclaris has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

158.    Plaintiff on behalf of Aclaris has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Aclaris in a manner consistent with the operations of a publicly-held corporation.

161.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Aclaris has sustained and will continue to sustain significant damages.

162.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

163.    Plaintiff on behalf of Aclaris has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

164.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

166.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct, thereby wasting the Company's assets.

167.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

168.    Plaintiff on behalf of Aclaris has no adequate remedy at law.

## PRAYER FOR RELIEF

169.     FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Aclaris, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Aclaris;

(c)     Determining and awarding to Aclaris the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Aclaris and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Aclaris and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Aclaris to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Aclaris restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: November 25, 2019             Respectfully submitted,


**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Bruce Brown am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2019.

11/17/2019

Bruce Brown
_____
Bruce Brown